1

2

3

4

5

6

7

8

9

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| 10 | MICHAEL D. ROMAN, ) | NO. ED CV 04-1226 JFW (FMO) |
| 11 | ) | |
| 12 | Petitioner, ) | ORDER |
| 13 | v. ) | |
| 14 | ANTHONY HEDGPETH, Warden, ) | |
| 15 | Respondent. ) | |
| 16 | | |

17    Pursuant to 28 U.S.C. § 636, this Court has reviewed the Petition and other papers along

18  with the Report and Recommendation of United States Magistrate Judge filed on June 30, 2008,

19  as well as any objections filed, and has made a de novo determination. This Court concurs with

20  and adopts all of the findings and conclusions of the Magistrate Judge in his Report and

21  Recommendation, except for Section II(C) and (D) entitled "Applicable Federal Law" and

22  "Analysis". Section II (C) and (D), at pages 26 through 61, are hereby stricken, and replaced with

23  the following:[1]

24

25

26      [1]   To the extent any finding or conclusion of the Magistrate Judge in his Report and
27  Recommendation conflicts with the findings and conclusions contained in this Order, those
    findings and conclusions of the Magistrate Judge are hereby stricken and replaced with the
28  findings and conclusions contained in this Order.

II.   JURY MISCONDUCT.

C.   Applicable Law

The Sixth Amendment, which is applicable to the states through the Fourteenth Amendment, guarantees criminal defendants the right to be tried "by a panel of impartial, 'indifferent' jurors." Morgan v. Illinois, 504 U.S. 719, 727 (1992); Irvin v. Dowd, 366 U.S. 717, 722 (1961). The bias or prejudice of even a single juror violates the petitioner's right to a fair trial. See Parker v. Gladden, 385 U.S. 363, 366 (1966) ("[P]etitioner was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors."); Tinsley v. Borg, 895 F.2d 520, 523-24 (9th Cir. 1990).

A necessary corollary to this right is the requirement that a jury's verdict be based solely on the evidence presented at trial. Turner v. Louisiana, 379 U.S. 466, 472-73 (1965); see Fields v. Brown, 503 F.3d 755, 779 (9th Cir. 2007) (en banc), cert. denied, 128 S.Ct. 1875 (2008) ("The core principle is well-settled: evidence developed against a defendant must come from the witness stand."); Bayramoglu v. Estelle, 806 F.2d 880, 887 (9th Cir. 1986) ("Jurors have a duty to consider only the evidence which is presented to them in open court."). When the jury considers extraneous facts not introduced in evidence, a defendant has effectively lost the rights of confrontation, cross-examination, and the assistance of counsel. Hughes v. Borg, 898 F.2d 695, 700 (9th Cir. 1990).

More than a century ago, the United States Supreme Court established that "[p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." Mattox v. United States, 146 U.S. 140, 150 (1892). In Remmer v. United States, 347 U.S. 227, 229 (1954), the Supreme reaffirmed this principle, holding: "[A]ny private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . . The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant."

2

Several circuits have applied the Remmer presumption whenever a jury is exposed to extrinsic information. See, e.g., Mayhue v. St. Francis Hosp. of Witchita, 969 F.2d 919, 922 (10th Cir. 1992) ("A rebuttable presumption of prejudice arises whenever a jury is exposed to external information in contravention of a district court's instructions."); United States v. Perkins, 748 F.2d 1519, 1533 (11th Cir. 1984) ("Prejudice from extrinsic evidence is assumed in the form of a rebuttable presumption and the government bears the burden of demonstrating that the consideration of the evidence was harmless."); United States v. Hillard, 701 F.2d 1052, 1064 (2d Cir. 1983) ("We recognize that extra-record information that comes to the attention of a juror is 'presumptively prejudicial.'").[2]   Moreover, it has been applied when the jury's review of such extrinsic information was a result of juror misconduct, and not jury tampering.  See, e.g., United States v. Martinez, 14 F.3d 543 (11th Cir. 1994) (applying Remmer presumption where jurors considered media coverage and consulted a dictionary).

The Remmer presumption of prejudice has also  been applied in situations very similar to the one at issue here.  For example, the Ninth Circuit has applied the Remmer presumption of prejudice to cases involving a jury's exposure to extrinsic information from official documents and records.  See United States v. Harber, 53 F.3d 236 (9th Cir. 1995) (applying the presumption of prejudice where a copy of a case agent's report containing an opinion that the defendant was guilty had been left in the jury room).  In addition, the Eighth Circuit has concluded that the Remmer presumption of prejudice applies when jurors are exposed to extrinsic information about a defendant's prior conviction.  See United States v. Swinton, 75 F.3d 374, 382 n.6 (8th Cir. 1996) ("[P]roof that one juror informed other jurors of defendant's prior conviction would constitute a prima facie showing of prejudice.").

_____

[2]   Other circuits have applied the presumption of prejudice only when the extrinsic information is of a considerably serious nature.  See United States v. Lloyd, 269 F.3d 228, 238 (3rd Cir. 2001) ("[T]his court has applied the presumption of prejudice only when the extraneous information is of a considerably serious nature."); United States v. Boylan, 898 F.2d 230, 261 (1st Cir. 1990) ("[T]he Remmer standard should be limited to cases of significant ex parte contacts with sitting jurors or those involving aggravated circumstances far beyond what has been shown here.)

1    To rebut the presumption of prejudice, the government must prove that the consideration

2  of extrinsic evidence or jury misconduct was "harmless beyond a reasonable doubt" within the

3  meaning of Chapman v. California, 386 U.S. 18 (1967).  See, e.g, United States v. Harber, 53 F.3d

4  236, 242-43 (9th Cir. 1995) ("The Government bears the burden of persuading the court beyond

5  a reasonable doubt that the presence of extrinsic material in the jury room during deliberations

6  was harmless error.");  United States v. Davis, 60 F.3d 1479, 1485 (10th Cir. 1995); United States

7  v. Santana, 175 F.3d 57, 65-66 (1st Cir. 1999).  Many circuits, including the Ninth Circuit, instead

8  of using the "harmless beyond a reasonable doubt" language, often state that the government

9  must prove that "there is no reasonable possibility" that the alleged misconduct or consideration

10  of extrinsic evidence influenced the verdict.  See, e.g., Caliendo v. Warden of California Men's

11  Colony, 365 F.3d 691, 696 (9th Cir. 2004).  This standard is equivalent to the harmless beyond

12  a reasonable doubt standard.  See United States v. Navarro-Garcia, 926 F.2d 818, 821 n.1 (9th

13  Cir. 1991).[3]

14    D.    Analysis

15    1.    **The Court of Appeal's Decision Was Not Contrary To Clearly**

16         **Established Federal Law.**

17    The law applied by the Court of Appeal was not contrary to clearly established Supreme

18  Court precedent.  Under the "contrary to" clause, "a decision by a state court is 'contrary to' [the

19  Supreme Court's] clearly established law if it 'applies a rule that contradicts the governing law set

20  forth in [the Supreme Court's] cases' or if it 'confronts a set of facts that are materially

21  _____

22    [3]    The Ninth Circuit often does not use or refer to the Remmer presumption of prejudice in
    instances where the jury has considered extrinsic evidence.  Instead, the Ninth Circuit first
23  considers whether there is "a reasonable possibility that the [extraneous] material could have
    affected the verdict." Hughes v. Borg, 898 F.2d 695, 700 (9th Cir. 1990).  If there is a reasonable
24  possibility that the extraneous material could have affected the verdict, the defendant is "entitled
    to a new trial unless the government can prove that any constitutional error was harmless beyond
25  a reasonable doubt."  In this case, the tests are functionally equivalent, as there is a "reasonable
    possibility" that the consideration of Petitioner's two prior strikes could have affected the verdict.
26  Thus, the burden of proof shifts to the government to show that the constitutional error was
    harmless beyond a reasonable doubt (or that there was "no reasonable possibility" that the error
27  affected the verdict).  In this case, this Court uses the Remmer test, because the Court of Appeal
28  applied a test that is equivalent to the Remmer test.

1  indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result
2  different from [Supreme Court] precedent.'" Price v. Vincent, 538 U.S. 634, 640 (2003) (quoting
3  Williams v. Taylor, 529 U.S. 362, 405-06 (2000). "[E]xcept in the extremely rare circumstance in
4  which a state case presents facts that are materially identical to those in a Supreme Court case,
5  it is difficult to imagine many situations in which the *result* of a state court adjudication could be
6  contrary to clearly established Supreme Court precedent." Frantz v. Hazey, 533 F.3d 724, 734
7  (9th Cir. 2008) (en banc).

8      In reviewing a state court's decision under § 2254(d)(1), "the Supreme Court has . . .
9  cautioned federal courts to read state court decisions carefully to determine the rule that *actually*
10 governed the state court's analysis." Frantz, 533 F.3d at 737 (citing Holland v. Jackson, 542 U.S.
11 649, 654-55 (2004) (per curiam); Woodford v. Visciotti, 537 U.S. 19, 23-24 (2002) (per curiam)).
12 However, "[a]voiding [a 'contrary to' error] does not require citation . . . [or] *awareness* of
13 [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision
14 contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002).

15     Although the Court of Appeal did not cite to Supreme Court precedent such as Remmer,
16 or mention the Sixth Amendment,[4] neither the reasoning nor the result of the state-court decision
17 contradicts them. The Court of Appeal stated the test as follows: "Once misconduct has been
18 established, prejudice is presumed; reversal is required unless the reviewing court finds, upon
19 examination of the entire record, there is no substantial likelihood that any juror was improperly
20 influenced to the defendant's detriment." People v. Roman, 2003 WL 21949766, at *4 (Cal. Ct.
21 App. Aug. 15, 2003). In applying the test, the Court of Appeal assumed *arguendo* that misconduct

22

---

23     [4]   The Court of Appeal analyzed Petitioner's claim under California Penal Code Section §
24 1181. The relevant portions of California Penal Code § 1181 state:

25        When a verdict has been rendered or a finding made against the defendant, the
          court may, upon his application, grant a new trial, in the following cases only: . . .
26        2. When the jury has received any evidence out of court, other than that resulting
          from a view of the premises, or of personal property;
27        3. When the jury has . . . been guilty of any misconduct by which a fair and due
          consideration of the case has been prevented[.]

28

had been established and presumed prejudice.  See id. at *6 ("Assuming arguendo that the jury's reading of the redacted portion of the transcript, failure to obey the court's instruction, and discussion of facts as to which there was no evidence, were misconduct, a presumption of prejudice arises.").  It then considered whether the presumption of prejudice was "rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct." Id. at *6.  The Court of Appeal concluded "there was no reasonable probability of actual harm to defendant resulting from the misconduct." Id. at *6.[5]

The standard as stated by the Court of Appeal, although differently phrased than the Supreme Court's test in Remmer or the harmless error test in Chapman, includes the same core elements: (1) a presumption of prejudice, and (2) and a heavy burden to rebut that prejudice, equivalent to the Chapman harmless error test.[6]  Moreover, nothing in the Court of Appeal's test contradicts Supreme Court precedent or the rights protected by the Sixth Amendment.

Accordingly, the Court of Appeal's decision was not contrary to clearly established federal law, as determined by the Supreme Court.

_____

[5]   Although the Court of Appeal stated that it was reviewing the trial court's decision not to grant a motion for a new trial for an abuse of discretion, the Court of Appeal also conducted a seemingly independent review to conclude that "there was no reasonable probability of actual harm" to the Petitioner.  This Court must give the Court of Appeal's decision the benefit of the doubt.  Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam) (section 2254(d) "demands that state-court decisions be given the benefit of the doubt.").

[6]   The Court of Appeal's version of the test to rebut prejudice relies on Chapman v. California, 386 U.S. 18 (1967).  See, e.g., People v. Diaz, 152 Cal. App. 3d 926 934 (1984); People v. Martinez, 82 Cal. App.3d 1, 22 (1978).  Furthermore, the Court of Appeal's conclusion that "there was no reasonable probability of actual harm to defendant resulting from the misconduct," is virtually identical to the Ninth Circuit's wording of the Remmer test.  See Caliendo v. Warden of California Men's Colony, 365 F.3d 691, 697 (9th Cir. 2004) (emphasis added) ("Prejudice is presumed, . . . and the defendant's motion for a new trial must be granted unless the prosecution shows that there is no reasonable possibility that the communication will influence the verdict.").  And, the Ninth Circuit's test to rebut prejudice is akin to the Chapman test.  See United States v. Navarro-Garcia, 926 F.2d 818, 821 n.1 (9th Cir. 1991).

## 2.    The Court of Appeal's Decision Was Based On An Unreasonable Application Of Clearly Established Federal Law.

Even if the Court of Appeal identified the correct governing legal principle, habeas relief may be granted if the Court of Appeal unreasonably applied that principle to the facts of Petitioner's case.  28 U.S.C. § 2254(d)(1); Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

A federal court making the "unreasonable application" inquiry asks "whether the state court's application of clearly established federal law was objectively unreasonable." Williams v. Taylor, 529 U.S. 362, 409 (2000).  Although the Supreme Court has not provided a specific definition of "objectively unreasonable," it has made clear that an unreasonable application of federal law is different from an incorrect application of federal law, explaining that "[u]nder § 2254(d)'s 'unreasonable application' clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly." Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002) (per curiam); accord Rice v. Collins, 546 U.S. 333, 342 (2006); Williams v. Taylor, 529 U.S. 362, 411 (2000); Andrade, 538 U.S. at 75-76; Edwards v. Lamarque, 475 F.3d 1121, 1125 (9th Cir. 2007) cert. denied, 128 S. Ct. 532 (2007).   "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." Andrade, 538 U.S. at 75.

"[O]nly the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied." Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003).  This Court cannot reverse a state court decision merely because that decision conflicts with Ninth Circuit precedent on a federal Constitutional issue.  However, Ninth Circuit precedent, as well as precedent from other circuits "may be persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law." Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000).  See also Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003).

In this case, the only issue is whether the Court of Appeal unreasonably applied the harmless error test to the facts.  The starting point of this Court's analysis is Supreme Court

precedent.  In <u>Mattox v. United States</u>, 146 U.S. 140 (1892), the Supreme Court directed a new trial to be granted, stating:

> The jury in the case before us retired to consider of their verdict on the 7th of October, and had not agreed on the morning of the 8th, when the newspaper article was read to them.  It is <u>not open to reasonable doubt</u> that the tendency of that article was injurious to the defendant.  Statements that the defendant had been tried for his life once before; that the evidence against him was claimed to be very strong by those who heard all the testimony; that the argument for the prosecution was such that the defendant's friends gave up all hope of any result but conviction; and that it was expected that the deliberations of the jury would not last an hour before they would return a verdict, – could have no other tendency.  Nor can it be legitimately contended that the misconduct of the bailiff could have been otherwise than prejudicial.  Information that this was the third person Clyde Mattox had killed, coming from the officer in charge, precludes any other conclusion.

146 U.S. 140, 150-51 (1892) (emphasis added).

Similarly, in <u>Parker v. Gladden</u>, 385 U.S. 363 (1966), the Supreme Court held that the defendant's Sixth Amendment rights were violated where  the bailiff remarked to certain jurors that the defendant was a "wicked fellow," that he was guilty, and that if there was anything wrong in finding defendant guilty, the Supreme Court would correct it.  The Supreme Court did not find the Sixth Amendment violation harmless, relying on the following facts: (1) a bailiff as an officer of the court carries great weight with a jury; (2) the jurors deliberated 26 hours, indicating a difference among them as to the guilt of the petitioner; and (3) the testimony of one juror that she was prejudiced by the statements.  <u>Gladden</u>, 385 U.S. at 365.  The Supreme Court stated, "'it would be blinking reality not to recognize the extreme prejudice inherent' in such statements that reached at least three members of the jury and one alternate member."  <u>Id.</u> (citation omitted).

In both of these cases, the nature of the prejudicial information in part concerned the defendant's alleged bad character or propensity to violate the law.  Accordingly, circuit courts have overwhelmingly granted habeas relief or ordered new trials when the jury's receipt of prejudicial

information included evidence of the facts surrounding a defendant's prior conviction, bad

reputation, or propensity to violate the law.  See, e.g., Lawson v. Borg, 60 F.3d 608 (9th Cir. 1995)

(granting habeas petition where a juror improperly told the jury that the defendant was violent);

Jeffries v. Blodgett (Jeffries I), 5 F.3d 1180, 1191 (9th Cir. 1993) (granting habeas petition where

the jury learned that the defendant had previously committed armed robbery); Dickson v. Sullivan,

849 F.2d 403, 408-09 (9th Cir. 1988) (granting habeas petition after jurors were told that the

defendant, on trial for bludgeoning a man to death with a pool cue, had "done something like this

before."); Bonner v. Holt, 26 F.3d 1081 (11th Cir. 1994) (granting habeas petition where jury

learned defendant was a "habitual offender");  United States ex rel. Owen v. McMann, 435 F.2d

813 (2nd Cir. 1970) (affirming grant of habeas petition where jurors learned from other jurors that

the "defendant had been in trouble all his life; that he had been suspended from the police force

in connection with the unauthorized use of a prowl car; that he had been involved in a fight in a

tavern; that one of the juror's husband was an investigator and that he knew all about plaintiff's

background and character, which was bad; and that petitioner's father was always getting him out

of trouble"); United States v. Keating, 147 F.3d 895 (9th Cir. 1998) (on direct appeal, granting new

trial where the information about defendant's prior conviction was available to the jury for some

time, was discussed between jurors, and was highly prejudicial).[7]  All of these courts found that

the juror's consideration of the extrinsic evidence could not have been harmless beyond a

reasonable doubt, or found actual prejudice, i.e.  the constitutional error had a substantial and

injurious effect or influence in determining the jury's verdict.  When circuit courts agree on the

application of Supreme Court precedent, it is persuasive evidence that a state court decision

contrary to that application is an unreasonable application of Supreme Court law.[8]

---

[7]   Cf. United States v. Howard, 506 F.2d 865 (5th Cir. 1975) (vacating order of district court denying new trial and remanding for the court to hold hearing where one juror informed the jury that defendant had been in trouble two or three times);  Mancuso v. Olivarez, 292 F.3d 939, 953 (9th Cir. 2002) ("Juror misconduct cases in which habeas relief has been granted often involve the jury's receipt of information excluded from trial as unduly prejudicial such as evidence of the facts surrounding a defendant's prior conviction, bad reputation, or propensity to violate the law.").

[8]   In sharp contrast, there are very few cases that have denied habeas relief when the

1    Here, the information that Petitioner had two strikes and had been in prison before was at

2    least as serious, if not more serious, than the information communicated to the jury in many of

3    these cases, most importantly the Supreme Court's decision in Parker.  See, e.g., Parker, 385

4    U.S. at 363-64, 87 S.Ct. at 470 (bailiff told a juror the defendant was a "wicked fellow" and that if

5    there were anything wrong in finding the defendant guilty, the Supreme Court would fix it); Bonner

6    v. Holt, 26 F.3d 1081 (11th Cir. 1994) (granting habeas petition where jury learned defendant was

7    a "habitual offender").  Moreover, as discussed further in § II.D.3,[9]  the undisputed facts in this

8    case only reaffirm the inherently prejudicial nature of the extrinsic evidence: (1) petitioner's

9    defense at trial was self-defense; (2) after two days of deliberation, the jury was at a "standstill"

10   _____

11   extrinsic evidence included facts surrounding a defendant's prior conviction, bad reputation, or
     propensity to violate the law.  However, the facts of those cases were significantly different than
12   those here.  See Mancuso v. Olivarez, 292 F.3d 939 (2002)(no indication that the jury could not
     reach a unanimous verdict just before receiving the improper evidence); Lacy v. Gabriel, 732 F.2d
13   7 (1st Cir. 1984) (improperly exposed material was cumulative of information already before the
14   jury).

15       [9]    This Court also hereby incorporates the discussion set forth in § II.D.3 (applying the Brecht
     standard), because, under the circumstances of this case, much of what is set forth in that section
16   also supports a finding of an "unreasonable application" of clearly established federal law.  In fact,
17   in Fry v. Pliler, the Supreme Court stated:

18       Given our frequent recognition that AEDPA limited rather than expanded the
         availability of habeas relief, it is implausible that, without saying so, AEDPA replaced
19       the Brecht standard of "'actual prejudice,'" with the more liberal AEDPA/Chapman
         standard which requires only that the state court's harmless-beyond-a reasonable
20       doubt determination be unreasonable.  That said, it certainly makes no sense to
         require formal application of both tests (AEDPA/Chapman and Brecht) when the
21       latter obviously subsumes the former.

22   127 S. Ct. 2321, 2327 (2007) (internal citations omitted).

23

24       Accordingly, since the Supreme Court's decision in Fry v. Pliler, several circuit courts have
     concluded that the Brecht test entirely subsumes the unreasonable application test when it
25   involves the state court's Chapman harmless error analysis.  See, e.g., Wilson v. Mitchell, 498
     F.3d 491, 503 (6th Cir. 2007) ("[A] federal habeas court technically applies Brecht in light of
26   AEDPA, but because the Brecht test is stricter (i.e., tougher on the petitioner) than
     AEDPA/Chapman, any petitioner that meets the Brecht standard will necessarily meet the
27   AEDPA/Chapman standard.).  The Ninth Circuit however has not yet examined the implications
     of Fry on the AEDPA/Chapman standard, and, out of caution, this Court has conducted an
28   analysis using both tests.  There is, of course, substantial overlap between the two analyses.

1   as to petitioner's guilt, i.e., as to whether he was justified in shooting the victim (see CT 280 & 282;

2   RT 1079); (3) the trial court had ruled that Justin's statements that Petitioner had two strikes and

3   had been in prison before were inadmissible because they were unduly prejudicial (see RT 149,

4   849, 906); (4) Justin's statements were introduced to the jury's deliberations on the fourth day of

5   deliberations (see CT at 283-84 & 325); and (5) the jury, after reviewing Justin's statements,

6   reached a unanimous verdict as to second-degree murder (see CT at 298).

7   　　　Given these undisputed facts, the factors relied on by the Court of Appeal do not establish

8   that the juror misconduct was harmless.  For example, the Court of Appeal heavily relied on the

9   evidence of Petitioner's guilt presented at trial.  See People v. Roman, 2003 WL 21949766, at *7

10   (Cal. Ct. App. Aug. 15, 2003) ("Furthermore, the evidence presented at trial overshadowed any

11   potential prejudice from the brief reference to defendant's alleged strikes and prior prison time.).

12   The Supreme Court has cautioned more than once that "[t]he inquiry cannot be merely whether

13   there was enough to support the result, apart from the phase affected by the error."  Kotteakos

14   v. United States, 328 U.S. 750, 765 (1946); see also Brecht, 507 U.S. at 642 (Stevens, J.,

15   concurring) ("[W]e would misread Kotteakos itself if we endorsed only a single-minded focus on

16   how the error may (or may not) have affected the jury's verdict.  The habeas court cannot ask only

17   whether it thinks the petitioner would have been convicted even if the constitutional error had not

18   taken place. . . .  It requires a reviewing court to decide that the error did not influence the jury and

19   that the judgment was not substantially swayed by the error.") (internal quotation marks, footnote

20   and citations omitted)[10]  And, significantly, the jury in this case deliberated for more than 6 days

21   and sent two notes to the judge indicating that the jury  was at a "standstill", and could not

22   "unanimously decide guilt or innocence in any of the charges." (See CT 280 & 282; RT 1079).

23   Given the clear evidence that the jury struggled with the verdict in this case, this Court concludes

24   that the evidence of guilt was not so overwhelming as to rebut the presumption of prejudice.  See,

25   e.g., Parker v. Gladden, 385 U.S. 363, 365 (1966) (relying on the fact that "the jurors deliberated

26   _____

27   　　　[10]　In fact, the Court of Appeal ignored its own warning that "[c]onvincing evidence of guilt does

28   not deprive a defendant of the right to a fair trial." People v. Roman, 2003 WL 21949766, at *6
    (Cal. Ct. App. Aug. 15, 2003).

1    for 26 hours, indicating a difference among them as to the guilt of petitioner," in concluding that

2    the error was not harmless).[11]

3        The Court of Appeal also relied on its conclusion that the references to the alleged two

4    strikes and prior prison time were "insignificant" because they were "brief" and "unemphatic."

5    However brief the jury's discussion of the redacted information may have been, the references

6    were not unemphatic.[12]   Significantly, nine of the twelve jurors remembered that the redacted

7

_____

8    [11]   Moreover, the Court of Appeal's reliance on the evidence demonstrating how the victim was

9    shot by petitioner, as a basis for its decision is not probative where, as here, Petitioner did not

10    dispute that he shot the victim. (See RT at 869-72). Specifically, the Court of Appeal stated: "The testimonies at trial established that the victim walked into the garage, and [petitioner] start[ed] talking to him. [Petitioner] told Justin to go get a gun.  When Justin did not retrieve the gun,

11    [petitioner] immediately retrieved the gun himself, and returned to the garage. [Petitioner] shot the victim twice, in quick succession." See People v. Roman, 2003 WL 21949766, at *7 (Cal. Ct. App.

12    Aug. 15, 2003)).  The Court of Appeal's recitation of the "evidence" inexplicably ignores the nature of petitioner's defense, i.e. that he was not guilty because he acted in self-defense.  (See RT at

13    1036, 1044 & 1052).   The Court of Appeal made no mention of Petitioner's evidence in support of his self-defense claim.  For example, Petitioner testified that he had been previously warned

14    by the boyfriend of the victim's sister "not to trust [the victim] and to keep [him] away from [petitioner's] house because [the victim is] devious and [will] do whatever it takes to get what he

15    wants [and the petitioner should] not . . . trust him around [his] family."  (RT at 862; see also id.

16    at 410).  The victim appeared at the entrance to petitioner's garage, smelling of alcohol and looking like he was "all messed up" on drugs, dressed in a bulky coat with his hand in his pocket,

17    even though it was a summer evening. (Id. at 860-65). Autopsy evidence revealed that the victim had a blood alcohol level of .15 and 63 nanograms of methamphetamine in his system, which

18    might have been higher or lower at the time of the victim's death. (Id. at 786-87).  The victim threatened to go into petitioner's home and rob him. (Id. at 864-65 & 894).  Petitioner told the

19    victim to leave his property. (Id. at 866).  When the victim would not, petitioner, fearing for his

20    safety and the safety of his family, ran into his house, grabbed and loaded his gun and returned to the garage with the gun in his pocket. (Id. at 867).  Petitioner told the victim he was armed and

21    demanded that he leave the garage. (Id. at 869).  Instead, the victim laughed and lunged at

22    petitioner, and petitioner fired his gun. (Id. at 870).  Petitioner fell down backwards after the first shot and did not remember firing the second shot. (Id. at 870-72).

23     A pathologist testified that the trajectory of the fatal bullet was consistent with a scenario

24    where the shooter had been in a lower position than the victim. (RT at 683-99). Petitioner argued that the wound trajectory was consistent with him having fired the fatal shot after falling backwards

25    onto the floor of the garage. (See id. at 1046-47). Justin's testimony confirmed that the victim was

26    lunging at petitioner before the first shot was fired. (Id. at 640).  Petitioner's wife's preliminary hearing testimony, which was introduced at trial, also confirmed that the victim lunged at petitioner.

27    (Id. at 535).

28    [12]   To the extent this is a factual finding, this Court concludes it was based an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, pursuant

1   information referred to petitioner's prior strikes.  (See RT at 1107-08, 1111, 1115, 1118-19, 1128,

2   1137, 1148, 1156 & 1165).  In addition, as discussed further in § II.D.3, in California, where

3   citizens have been asked to vote on various ballot initiatives regarding California's Three Strikes

4   law, the term "strike" is not a vague reference, i.e., it generally refers to violent or serious crimes

5   committed by habitual offenders.  And, there is no doubt that the highly prejudicial information was

6   received by the jury at a crucial time in the deliberations because they had just advised the trial

7   judge that they were at a "standstill" as to Petitioner's guilt.  In fact, three jurors testified that the

8   jury was split at the time of or just before the jury reviewed the redacted statements.  (See RT at

9   1139, 1148, 1167).

10          Finally, the Court of Appeal relied on the testimony of three jurors that they agreed or

11   reached a consensus that the redacted portion was not part of the evidence and that it was not

12   to play any part in their decision-making.   However, it is well-settled that a jury's discussion of

13   improper evidence is not rendered harmless merely because the jurors agreed to "ignore" the

14   evidence.  See Jeffries v. Wood (Jeffries II), 114 F.3d 1484, 1491 (9th Cir. 1997) (en banc), cert.

15   denied, 522 U.S. 1008 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 324

16   (1997) ("Jurors' testimony that extrinsic evidence is not harmful is not controlling.  The effect of

17   extrinsic prejudicial evidence on a juror's deliberation may be substantial even though it is not

18   perceived by the juror, and a juror's good faith cannot counter this effect.") (internal quotation

19   marks and citations omitted); Caliendo v. Warden of California Men's Colony, 365 F.3d 691, 699

20   (9th Cir. 2004) ("Given the conflicting evidence in Caliendo's case and the centrality of Mundell's

21   testimony to the prosecution, the jurors' claims that the encounter [with Mundell] would not

22   influence them did not suffice to meet the government's heavy burden of proving harmlessness.");

23   United States v. Harry Barfield Co., 359 F.2d 120, 123 (5th Cir. 1966) (stating that juror's

24   testimony that he was not influenced by a conversation he had with one of the parties about non-

25   trial related matters was not dispositive because "it would no doubt be difficult to have a juror admit

26   that he was influenced by such an approach.").   Furthermore, even if just one juror was

27   ──────────────

28   to 2254(d)(2).

1  improperly influenced by Justin's statements, the constitutional error is not harmless.  <u>See, e.g.</u>,

2  <u>Parker v. Gladden</u>, 385 U.S. 363, 366 (1966) ("[P]etitioner was entitled to be tried by 12, not 9 or

3  even 10, impartial and unprejudiced jurors.").  Here, given the nature of the prejudicial statements,

4  the crucial timing when they were received, and the centrality of Petitioner's credibility to his self-

5  defense claim, this Court has little difficulty in concluding that the jurors' claims that they ignored

6  the evidence cannot counter the prejudicial effect of the extrinsic evidence.  <u>See infra</u> at II.D.3.

7       Given the undisputed facts in this case, the Supreme Court's decision in <u>Parker v. Gladden</u>,

8  385 U.S. 363 (1966), and the overwhelming circuit authority that finds this type of evidence

9  prejudicial and harmful,  the Court of Appeal could not have reasonably concluded that the jury's

10  consideration of the extrinsic evidence was harmless beyond a reasonable doubt.  This Court

11  concludes that the Court of Appeal's application of Supreme Court law was objectively

12  unreasonable, pursuant to § 2254(d)(1).

13       **3.     The Jury Misconduct Had a Substantial and Injurious Effect or Influence**

14       **in Determining the Jury's Verdict.**

15       "[W]here the analysis on federal habeas . . . results in the conclusion that § 2254(d)(1) is

16  satisfied, then federal habeas courts must review the substantive constitutionality of the state

17  custody de novo."  <u>Frantz v. Hazey</u>, 533 F.3d 724, 737 (9th Cir. 2008).  Here, there is no real

18  question that the jury reviewed the redacted portion of the transcript containing Justin's statements

19  that Petitioner had two strikes and had been in prison before, and thus this Court easily concludes

20  that the jury's conduct constitutes a Sixth Amendment violation.[13]  <u>See, e.g.</u>, <u>Lawson v. Borg</u>, 60

21  F.3d 608, 612 (9th Cir. 1995) ("Jury exposure to facts not in evidence deprives a defendant of the

22  _____

23      [13]   Ten of twelve jurors testified that they reviewed the redacted transcript.  (<u>See</u> RT at 1107,
24  1111, 1114-15, 1118, 1128, 1137, 1147, 1155, 1162 & 1165).  The trial court's ruling and the Court
    of Appeal's opinion both implicitly acknowledge that the jury received and reviewed the redacted
25  information.  (<u>See</u> RT at 1180 ("I find no evidence based on [the jurors'] testimony that any
    discussion of [the redacted transcript], which was obviously improper, [led] to the verdict that was
26  rendered . . . ."); <u>People v. Roman</u>, 2003 WL 21949766, at *6 (Cal. Ct. App. Aug. 15, 2003)
    ("[a]ssuming arguendo that "the jury's reading of the redacted portion of the transcript, failure to
27  obey the court's instruction, and discussion of facts as to which there was no evidence, were
    misconduct . . . .)).  The Court of Appeal however did not decide whether the jury's actions
28  constituted "jury misconduct," i.e. a Sixth Amendment violation.

rights to confrontation, cross-examination and assistance of counsel embodied in the Sixth Amendment.).

However, on habeas review, Petitioner is entitled to relief only if it can be established that the alleged constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  To determine whether Petitioner has been prejudiced by the introduction of extraneous evidence into the jury's deliberative process, the Court considers the following factors:

> (1) whether the extrinsic material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jury discussed and considered it; (4) whether the extrinsic material was introduced before a verdict was reached, and if so, at what point in the deliberations it was introduced; and (5) any other matters which may bear on the issue of whether the introduction of extrinsic material substantially and injuriously affected the verdict.

Mancuso v. Olivarez, 292 F.3d 939, 951-52 (9th Cir. 2002) (internal quotation marks, alterations and citation omitted); accord Lawson, 60 F.3d at 611.[14]

As part of the fifth factor, the Court considers:

> 1. whether the prejudicial statement was ambiguously phrased; 2. whether the extraneous information was otherwise admissible or merely cumulative of other evidence adduced at trial; 3. whether a curative instruction was given or some other step taken to ameliorate the prejudice; 4. the trial context; and 5. whether the statement was insufficiently prejudicial given the issues and evidence in the case.

_____

[14]  In Lawson, the Ninth Circuit modified the fifth factor "to take account of Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, . . . (1993) ." Fields, 503 F.3d at 779 n.18.  Thus, a finding of prejudice under the factors set forth above is, in effect, a finding of prejudice under Brecht.  See Lawson, 60 F.3d at 612; Fields, 503 F.3d at 779 n.18.

1    Mancuso, 292 F.3d at 952 (internal quotation marks and citation omitted).  While useful in

2    evaluating prejudice, "none of these factors should be considered dispositive."  Jeffries v. Blodgett

3    (Jeffries I), 5 F.3d 1180, 1190 (9th Cir. 1993).

4         Applying these factors, this Court concludes that the introduction of Justin's statements into

5    the jury's deliberations had a "substantial and injurious effect or influence in determining the jury's

6    verdict."  Brecht, 507 U.S. at 623 (internal quotation marks and citation omitted).

7         First, there is no dispute that the jury received the improper evidence when the transcript

8    was given to them. (See RT at 1107, 1111, 1114-15, 1118, 1128, 1137, 1147, 1155, 1162 & 1165)

9    (ten of twelve jurors admitting that they reviewed the redacted portion of Justin's transcript).

10        Second, "[w]hen assessing prejudice claims in juror misconduct cases, this court . . . places

11   great weight on the nature of the extrinsic evidence introduced."  Lawson, 60 F.3d at 612; see also

12   Mancuso, 292 F.3d at 950 (same); Sassounian v. Roe, 230 F.3d 1097, 1109 (9th Cir. 2000)

13   (same).  Here, it is clear that Justin's redacted statements – that petitioner allegedly had two prior

14   strikes and had been in prison before – are highly prejudicial.  See Jeffries v. Wood (Jeffries II),

15   114 F.3d 1484, 1490 (9th Cir. 1997) (en banc), cert. denied, 522 U.S. 1008 (1997), overruled on

16   other grounds by Lindh v. Murphy, 521 U.S. 320, 324 (1997) ("Juror knowledge of a defendant's

17   past criminal record has long been recognized as prejudicial."); United States v. Lewis, 787 F.2d

18   1318, 1323 (9th Cir. 1986), as amended, 862 F.2d 748 (9th Cir. 1988) (observing that it is

19   extremely difficult for jurors to ignore prior convictions when deciding guilt); Lawson, 60 F.3d at

20   612-13 (granting habeas petition where a juror improperly told the jury that the defendant was

21   violent); Dickson v. Sullivan, 849 F.2d 403, 407-09 (9th Cir. 1988) (granting habeas relief where

22   jury told by deputy sheriff that defendant had "done something like this before[]").  Indeed,

23   "[e]vidence of prior offenses is likely to prejudice a defendant even where a defendant has the

24   opportunity to rebut the evidence and take other ameliorative steps."[15] Dickson, 849 F.2d at 407.

25

26

27        [15]   As demonstrated below, petitioner did not have the opportunity to rebut Justin's statements

28   nor was the trial court able to take ameliorative steps such as giving the jury limiting instructions.
     See infra at 50-51 & 55.

1    And, here,  the information the jury had was all the more prejudicial because it was erroneously

2    overstated – petitioner had only one strike.  (See RT at 1192-93).

3           Third, the evidence of petitioner's prior strikes was not otherwise admissible.  Indeed, the

4    trial court had previously ruled petitioner's prior conviction inadmissible as unduly prejudicial.

5    (See, e.g., RT at 149, 849, & 906); see also Mancuso, 292 F.3d at 953 ("Juror misconduct cases

6    in which habeas relief has been granted often involve the jury's receipt of information excluded

7    from trial as unduly prejudicial such as evidence of the facts surrounding a defendant's prior

8    conviction, bad reputation, or propensity to violate the law."); Gibson v. Clanon, 633 F.2d 851, 855

9    (9th Cir. 1980), cert. denied, 450 U.S. 1035, 101 S.Ct. 1749 (1981) (fact that extraneous

10   information was previously ruled inadmissible is a relevant factor in determining prejudicial effect

11   on jury).

12          Fourth, the timing of the jury's receipt of the improper evidence was critical.  On August 2,

13   2001, during its third day of deliberations, the jury twice informed the judge that it was unable to

14   reach a verdict. (See CT at 280 & 282); (see also RT at 1079) (jury foreperson stating that "[w]e've

15   gone both ends of the spectrum.  Both ends.  I think we are stuck, standstill right now.").  On the

16   next day of deliberations, August 6, 2001, the jury received the redacted transcript, which

17   contained the erroneous information about petitioner's prior strikes and prison time.  (See CT at

18   283-84 & 325).  According to three jurors, the jury was "split" on whether to convict, at the time of

19   or just before the jury reviewed the redacted statements.  (See RT at 1139 (reporting that the jury

20   was split at the time the redacted information was read); 1147-48 (reporting that jury was split

21   50/50 when the redacted information was read); & 1167 (reporting that the jury was split just prior

22   to the redacted transcript was read)).  Over the next three days of deliberations, the jury's

23   discussions included the erroneous and prejudicial information (see generally, RT at 1106-67),

24   until only one or two "holdouts" remained.  (See id. at 1121 & 1153).  Eventually, those jurors

25   voted to convict.  (See id. at 1122 & 1152-53).  When one considers that the jury was at a

26   "standstill" and "split" at the time Justin's statements were introduced into the jury room, and that

27   unanimity came only after that point, there is little doubt that the timing of the jury's receipt of such

28   evidence had a substantial and injurious effect on the jury's verdict.  See Bonner v. Holt, 26 F.3d

1081, 1084 (11th Cir. 1994) (finding "strong evidence" that the error had a substantial and injurious effect in determining the jury's verdict where "there were two sets of deliberations in which the only difference in the evidence before the jury was the evidence admitted in error. The jury was at first unable to reach a unanimous verdict, but in the second round of deliberations, in which extrinsic evidence was considered, the jury returned a verdict of guilty."); <u>Lawson</u>, 60 F.3d at 612-13 (introducing improper evidence during second day of five-day protracted deliberations was a significant factor in finding prejudice); <u>Powell v. Collins</u>, 332 F.3d 376, 401 (6th Cir. 2003) (finding prejudicial error in a habeas case in part because the jury at one point told the court that it was "at a stalemate") (internal quotation marks omitted); <u>United States v. Varoudakis</u>, 233 F.3d 113, 127 (1st Cir. 2000) (noting, in weighing harmlessness, that "the jury's 'impasse' note reveals uncertainty about [the defendant's] guilt[]"); <u>Medina v. Barnes</u>, 71 F.3d 363, 369 (10th Cir. 1995) (basing prejudice determination in a habeas case in part on the fact that "at one point during their deliberations, the jurors indicated that they might be unable to reach a unanimous verdict"); <u>United States v. Fields</u>, 483 F.3d 313, 379 (5th Cir. 2007), <u>cert. denied</u>, 128 S.Ct. 1065 (2008) (Benavides, J., dissenting from Part II-A-I and dissenting, in part, from the judgment) ("Courts often have been unwilling to find error harmless where the record, as in this case, affirmatively shows that the jurors struggled with their verdict.").

   Fifth, the prejudicial statements were not ambiguously phrased. Although Respondent asserts that "the redacted portion of the transcripts merely contained general, vague references to 'strikes' and a prison sentence,"[16] Respondent's assertion fails to take into account that in California, where citizens have been asked to vote on various ballot initiatives regarding California's Three Strikes law, the term "strike" is not a vague reference, <u>i.e.</u>, it generally refers to violent or serious crimes committed by habitual offenders. Indeed, based on evidence relating to petitioner's prior strikes, the foreperson testified that the jury discussed that Petitioner was a "career criminal." (<u>See</u> RT at 1129). Another juror testified that a juror made a statement that

---

[16] Return at 17; <u>see also</u> <u>People v. Roman</u>, 2003 WL 21949766, at *7 (Cal. Ct. App. Aug. 15, 2003) ("[T]he redacted portion of the transcript merely contained statements by Justin that [petitioner] would go to jail because he had 'two strikes' and that [petitioner] had been in prison before.").

Petitioner has "done *it* three times[]". (<u>See</u> RT at 1149) (emphasis added).  The jurors' testimony indicates that they were aware that petitioner's prior strikes suggested that petitioner was a habitual offender who had committed and been convicted of serious crimes in the past.[17]  As discussed, such information is clearly prejudicial.

Sixth, although the jury was instructed not to consider "any evidence that was stricken by the court[,]" and to "decide all questions of fact . . . from the evidence received in this trial[,]" (CT at 176-77),[18] the trial court did not have an opportunity to contemporaneously instruct the jury not to consider Justin's statements to the police.  <u>See</u> <u>Sassounian</u>, 230 F.3d at 1111 (because the judge did not know about the improper evidence until after the verdict, "the judge never had an opportunity to diminish the prejudicial effect of the extraneous information[]"); <u>Schroeder v. Lewis</u>, 2003 WL 22768415, at *5 (N.D. Cal. 2003), <u>aff'd</u>, 121 F.App'x 175 (2004) ("[T]he trial court did not give a curative instruction or take any other type of ameliorative action, nor could it have, because

---

[17]   This Court recognizes that one juror testified that there was no discussion in his presence that Petitioner was a career criminal (RT 1165), and another juror testified that he had no memory of such a discussion (RT 1161).  This Court does not intend to disturb any implicit finding of fact that the Court of Appeal made about whether such a discussion took place.  Instead, this Court finds this testimony relevant to show that these two particular jurors were aware of the meaning of the term "strike" under California law.

[18]   The jury was instructed pursuant to CALJIC No. 1.02 and No. 1.03.  CALJIC No. 1.02, as given to the jury in this case, states:  "Statements made by the attorneys during the trial are not evidence. [¶]  However, if the attorneys have stipulated or agreed to a fact, you must regard that fact as proven[.] [¶]  If an objection was sustained to a question, do not guess what the answer might have been.  Do not speculate as to the reason for the objection.  [¶]  Do not assume to be true any insinuation suggested by a question asked a witness.  A question is not evidence and may be considered only as it helps you to understand the answer.  [¶]  Do not consider for any purpose any offer of evidence that was rejected, or any evidence that was stricken by the court; treat it as though you had never heard of it."  (CT at 176) (internal brackets omitted).

CALJIC No. 1.03, as given to the jury in this case, states:  "You must decide all questions of fact in this case from the evidence received in this trial and not from any other source.  [¶]  You must not independently investigate the facts or the law or consider or discuss facts as to which there is no evidence.  This means, for example, that you must not on your own visit the scene, conduct experiments, or consult reference works or persons for additional information.  [¶]  You must not discuss this case with any other person except a fellow juror, and then only after the case is submitted to you for your decision and only when all twelve jurors are present in the jury room. (<u>Id.</u> at 177).

the extrinsic evidence was not discovered until after the jury had already reached a verdict.").  As the Ninth Circuit stated in <u>Jeffries II</u>:

> Although the efficacy of instructions to ignore a defendant's prior convictions is highly questionable, *see Bayramoglu v. Estelle*, 806 F.2d 880, 888 (9th Cir. 1986) ("A timely instruction from the judge usually cures the prejudicial impact of evidence unless it is highly prejudicial or the instruction is clearly inadequate."), the potential for prejudice is certainly undiminished when no curative instruction was given and when 'the defendant was deprived of the opportunity to rebut the evidence, to discuss its significance in argument to the jury, or to take other steps to lessen its prejudicial impact, *Dickson*, 849 F.2d at 408.

114 F.3d at 1491 n.9. Further, the trial court's boilerplate instructions, CALJIC Nos. 1.02 and 1.03, were insufficient to offset the prejudicial impact of the redacted transcript.[19]  <u>See Dickson</u>, 849 F.2d at 406 & 408 (rejecting argument that trial court's instructions  that jury "base[] its decision solely on evidence admitted at trial" because the "efficacy of such instructions is subject to serious doubt" "where the extrajudicial statement concerns a defendant's prior criminal acts" and "especially . . . where, as here, the defendant was deprived of the opportunity to rebut the evidence").

Finally, to the extent Justin's redacted statements undermined petitioner's credibility, the extrinsic information directly related to a material issue in the case – petitioner's self-defense claim.  <u>See Lawson</u>, 60 F.3d at 612.  The prejudicial nature of Justin's statements and the impact such statements had on a material issue in this case is similar to the prejudicial nature of the information conveyed to the jury in <u>Lawson</u>, where the petitioner was on trial for premeditated murder.  <u>See</u> 60 F.3d at 609.  Lawson claimed that he went to the victim's house brandishing a firearm to get him to repay a debt and that he had no intent to kill the victim.  <u>Id.</u> at 609-610.

---

[19]   Also, this factor would render most jury misconduct cases harmless because jurors are uniformly instructed to rely only on the evidence presented at trial.

During the guilt phase deliberations, one of the jurors (Scott) stated to the other jurors that he had spoken with several people who knew Lawson and they stated that Lawson "was very violent" and had a "violent temper." Id. at 610 & n.2. The Ninth Circuit affirmed the district court's granting of the habeas petition, stating:

> Evidence introduced at trial concerning violent acts committed by Lawson was far from conclusive as to Lawson's intent to rob. Indeed, the jury struggled during deliberations with the question of "how much force can be lawfully used to collect a debt." Given the materiality of the interrelated issues of intent and use of force, Scott's statements that petitioner "was very violent" and "had a violent temper" cannot be deemed harmless.

Id. at 613 (footnote omitted).

Here, the pivotal jury issue was whether petitioner's use of force was justified to relieve him and/or reduce his level of legal culpability. Indeed, the jury's questions to the trial court prior to its receipt of Justin's statements indicate that they were focused on petitioner's self-defense claim. (See, e.g., Supp. Reply, Exh. D at 100 (requesting copy of the 1984 Homeowners Law – Right to Defend) & 104 (requesting a "read-back" of petitioner's and Justin's testimony)). The conflicting testimony and evidence presented at trial was such that the jury could not reach a verdict. (See RT at 1079) (jury foreperson stating that "[w]e've gone both ends of the spectrum. Both ends. I think we are stuck, standstill right now."). Thus, the issue was one of credibility. While the jury was struggling with whether petitioner was reasonable in responding with violence in the face of the threat posed by the victim, (see Supp. Reply, Exh. D at 100), there was no more damaging information for the jury to have received than the testimony of a family member that Petitioner had a history of criminal conduct or violence. See Lawson, 60 F.3d at 613; see also Griffin v. Berghuis, 298 F.Supp.2d 663, 676 (E.D. Mich. 2004) ("It is well settled that evidence of a prior conviction may be prejudicial to the accused, the danger being that the jury will misuse prior conviction evidence by focusing on the defendant's general bad character.") (internal quotation marks and citation omitted); 1990 Adv. Comm. Notes to Fed. R. Evid. 609(a) ("the danger that prior

convictions will be misused as character evidence is particularly acute" when offered against a criminal defendant).

Here, after all is said and done, these simple facts remain: (1) petitioner's defense at trial was self-defense; (2) after two days of deliberation, the jury was at a "standstill" as to petitioner's guilt, i.e., as to whether he was justified in shooting the victim; (3) Justin's statements relating to petitioner's alleged prior strikes and prison time, which the trial court ruled were inadmissible, were introduced to the jury's deliberations on the fourth day of deliberations; and (4) the jury, after reviewing and discussing Justin's statements, reached a unanimous verdict as to second-degree murder.  Putting aside the jurors' testimony as to the subjective effect of the evidence on any particular juror, see Sassounian, 230 F.3d at 1108, given the nature of the extrinsic information, the length of deliberations, the stage at which the extrinsic information was introduced, the evidence that certain jurors were persuaded by Petitioner's self-defense claim, and the centrality of Petitioner's credibility to Petitioner's self-defense claim, this Court concludes that the jury misconduct substantially and injuriously influenced the verdict.  See Lawson, 60 F.3d at 613 ("Given the length of deliberations, the early stage at which the extrinsic information was introduced, our knowledge that the jury was troubled by the issue of intent and its relation to use of force, and the centrality of this issue to the special circumstance constituting first degree murder, . . . we hold that the juror misconduct substantially and injuriously influenced the verdict.").

In Brecht, the Supreme Court imported the harmless error standard of Kotteakos v. United States, 328 U.S. 750, 776 (1946).  See Brecht, 507 U.S. at 623.  In Kotteakos, the Supreme Court explained the application of the substantial and injurious effect test:

> If, when all is said and done, the [court] is sure that the error did not influence
> the jury, or had but very slight effect, the verdict and the judgment should
> stand. . . .  But if one cannot say, with fair assurance, after pondering all that
> happened without stripping the erroneous action from the whole, that the
> judgment was not substantially swayed by the error, it is impossible to
> conclude that substantial rights were not affected.  The inquiry cannot be
> merely whether there was enough to support the result, apart from the phase

1   affected by the error.  It is rather, even so, whether the error itself had

2   substantial influence.  If so, or if one is left in grave doubt, the conviction

3   cannot stand.

4   328 U.S. at 764-65, 66 S.Ct. at 1248; see also O'Neal v. McAninch, 513 U.S. 432, 436 (1995)

5   ("When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of

6   federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that

7   error is not harmless.").

8       This Court cannot say with "fair assurance, after pondering all that happened without

9   stripping the erroneous action from the whole," that the verdict "was not substantially swayed" by

10  the introduction of Justin's statements into the deliberations.  See Kotteakos, 328 U.S. at 765.

11

12      For the foregoing reasons, this Court **GRANTS** Ground One of the Petition.

13

14      IT IS HEREBY ORDERED:

15  1.   That the findings and conclusions of the Report and Recommendation be accepted

16      and adopted, as modified by this Order;

17  2.   That Ground One of the Petition for Writ of Habeas Corpus is GRANTED;

18  3.   That Ground Two of the Petition for Writ of Habeas Corpus is DENIED with

19      prejudice;

20  4.   That Respondent is directed to release Petitioner unless the State of California

21      elects to grant Petitioner a new trial within 120 days of the filing date of this Order;

22  5.   That Judgment be entered consistent with this Order; and

23  6.   That the Clerk serve this Order and the Judgment on all counsel or parties of record.

24

25

26  Date:  October 8, 2008

27                                        JOHN F. WALTER
                                          UNITED STATES DISTRICT JUDGE

28